**C. F. LIEBERT**

v.

**UNITED STATES.**

**C.D. 3499; Protests 65/16181–25175, etc.**

United States Customs Court,
Second Division.

June 26, 1968.

---

Glad & Tuttle, Los Angeles, Cal. (George R. Tuttle, Los Angeles, of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Bernard J. Babb, New York City, trial attorney), for defendant.

Before RAO, FORD, and BECKWORTH, Judges.

BECKWORTH, Judge:

The merchandise involved in these cases consolidated at the trial, consists of parts of clutches for winches designated as Models 8A, 8G and 9, manufactured by Gearmatic, Ltd., of British Columbia. They were imported from Canada and entered at the port of Blaine, Washington, between May 1964 and March 1965. The merchandise was assessed with duty at 19 per centum ad valorem under item 680.54, Tariff Schedules of the United States, as parts of clutches. It is claimed to be dutiable at 10.5 per centum ad valorem under item 664.10, as parts of winches, or at 11.5 per centum ad valorem under item 692.35, as parts of tractors.

The pertinent provisions of the statute are as follows:

Item 680.54 of the Tariff Schedules of the United States:

> Gear boxes and other speed changers with fixed, multiple, or variable ratios; pulleys,

pillow blocks, and shaft couplings; torque converters; chain sprockets; clutches; and universal joints; all the foregoing and parts thereof (except parts of motor vehicles, aircraft, and bicycles):

\* \* \* \* \* \* \* \*

680.54     Chain sprockets, clutches, universal joints, and parts thereof ................. 19% ad val.

Item 664.10 of the Tariff Schedules of the United States:

Elevators, hoists, winches, cranes, jacks, pulley tackle, belt conveyors, and other lifting, handling, loading, or unloading machinery, and conveyors, all the foregoing and parts thereof not provided for in item 664.05 .... 10.5% ad val.

Item 692.35 of the Tariff Schedules of the United States:

Tractors (except tractors in item 692.40 and except automobile truck tractors), whether or not equipped with power takeoffs, winches, or pulleys, and parts of such tractors:

\* \* \* \* \* \* \* \*

692.35     Other ............................ 11.5% ad val.

General Headnotes and Rules of Interpretation:

10. General Interpretative Rules. For the purposes of these schedules—

\* \* \* \* \* \* \* \*

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

———◆———

At the trial, plaintiff called three witnesses and introduced five exhibits into evidence. Plaintiff's witnesses were C. F. Liebert, a licensed customhouse broker; William Bonar, sales and service manager of Gearmatic Co., Ltd., and Dwight Garrett, president and general manager of Garrett Enumclaw Company.

Mr. Bonar has been with Gearmatic for 21 years and said that its business is chiefly the manufacturer of winches. Prior to his association with Gearmatic, he had been logging manager for Beban Logging Company in British Columbia, and had previously been superintendent-manager with Crown Zellerbach of Canada. During that time he had operated all types of logging equipment including winches, hydraulic winches, tractor winches, tractors and trucks. Since his association with Gearmatic, he had sold winches and replacement parts all over the United States and in Canada. He sold winches designated as models 8A, 8G and 9 principally to tractor manufacturers. His experience included making calls on customers and dealers, training the men who go into the field, assisting them to train the customers, in the service department, and in the field. He had also made inspections in the field where problems occur with machinery to determine whether the difficulty was caused by the job, or a design failure, or weakness in the material in the products.

Mr. Garrett had been engaged in designing and manufacturing machinery,

mostly logging machinery, since about 1938. His firm has manufactured rubber-tired logging arches that were used behind crawler tractors and rubber-tired skidders. It has put two tractors together to get more horsepower. At one time it put rubber tires on crawler tractors manufactured by International Harvester. In 1958 it manufactured the first "Tree Farmer" tractor, a rubber-tired tractor which has revoluntionized the tractor industry. According to the witness, a few years ago 10 percent of the tractors used in log skidding were rubber-tired and 90 percent were crawler, but this has now been reversed. The witness had been active in the creation and design of the "Tree Farmer", had supervised its sales in 5 Western States and Hawaii and Alaska, had observed its use and had tested it himself.

Mr. Liebert testified that he had prepared the entries before the court and also a list of the items involved herein (exhibit 1), which he said were replacement parts imported for various purchasers of Gearmatic winches. He had made entries of such items for Gearmatic at the rate of 10 a month for the past 10 years. He stated that prior to September 1, 1963, duty was assessed under paragraph 372, Tariff Act of 1930, as modified, as machines, not specially provided for, at 12½ per centum to 10½ per centum ad valorem depending upon the date of entry.

Mr. Bonar testified that he was personally familiar with the parts involved herein and said that Gearmatic had developed the winches designated as models 8A, 8G and 9, and held patents on them. He explained that they were designed specifically as tractor winches of the free spooling variety, meaning the type of winch in which the operator can release both the clutch and brake at the same time and allow the drum to turn freely so he can pull the cable off and rotate the spool magnet. These winches are designed specifically for various makes of tractors, both crawler and rubber-tired, and are used almost exclusively in the logging industry. They are attached to a tractor as a means of allowing it, through its power, to reach out to the cable, take the legs, pull them into the tractor and hold them there while the tractor moves to its destination. "Winching on the fly" is one of the features of the Gearmatic Model A and Model 9 winches. This term means that the winch can be used whether or not the tractor is moving, a characteristic which is desirable in light tractor operations.

In crawler type tractors, winches are installed on the large flat surface on the back of the tractor. In skidder applications the winch is normally bolted by the skidder manufacturer either from the top, the bottom, or the sides of the winch. For many skidder manufacturers Gearmatic provides specific bolting to suit their method of installation.

Mr. Bonar had never seen the Model 8A, 8G or 9 winch used in tractors other than those which he had described, which were used in the logging industry.

According to the witness, one of the major features of these winches is compactness. He explained that in skidders, there has to be room to get the rigging off the ground when towing a log and space cannot be used up. In a small crawler tractor, a large winch would increase the distance from the rear axle of the tractor and complicate steering.

With the use of the diagrams and illustrations in exhibits 3 and 4 (Instructions and Parts Manuals for these winches), the witness described the various parts of the winches and their method of operation. The main components are the ring gear and pinion assembly which turns the shaft, the clutch assembly which is attached to the shaft and is used to engage the spool, the drum assembly, and the brake assembly. All of the parts are contained in a single main housing. The primary source of power to operate the winch is the tractor engine.

The clutch is mounted on the opposite end of the winch to the ring gear and pinion assembly. A master control, not normally on the winch but on the trac-

tor, is used to apply the clutch and release the brakes. It is usually mounted adjacent to the operator's position on the tractor where he can reach it easily. It could be mounted on the winch. When the load requires, a secondary clutch band becomes operative.

Mr. Bonar testified that each of the parts is necessary for the operation of the winch and that one of such parts is the clutch assembly. All of the articles involved in this case are located in the clutch assembly of the Model 8A, Model 8G, or Model 9 winch.

The witness explained that the type of clutch used in these winches was designed because a high capacity clutch had to be confined in a small area and that it had to be highly self-energizing but could not be of the common self-energizing type. He said that any type of clutch that was then in existence was unsatisfactory. He testified that the clutch was absolutely essential to the operation of the winch and that the clutch and parts thereof could not function other than in the winch. The parts were designed and manufactured specifically for this clutch and were not interchangeable with parts of other clutches. Mr. Garrett also testified that to his knowledge this clutch assembly does not have any other application than in the winch and that it is too expensive for other uses.

Mr. Bonar testified that to his knowledge there are standard types of clutches available in the trade for multi-purpose application, referred to as production type clutches. If he had to design a piece of equipment requiring a clutch such as a shaft mounted clutch or a flywheel mounted clutch to carry a given horsepower or torque r. p. m., he would only be restrained by price or availability in using any one of the standard makes.

Mr. Garrett testified that his firm has built 8 or 10 different tractor models and has used clutches, such as disc clutches, multiple plate clutches, and different friction clutches. The company keeps a reference library on clutches to determine what is available on the market as self-contained mass produced items. The witness said that there are many companies which manufacture clutches as standard items and that there are articles in the trade which are identified as mechanical power transmission equipment. He mentioned a power take-off clutch which would be bolted on the flywheel housing of an engine, an overrunning clutch which works only in one direction, a jaw clutch which is often used with a worm winch, and dental crawler clutches which are used in sliding gear type transmissions. There are some clutches in general use and some special types.

Mr. Bonar testified that these winches are used in the logging industry. He had seen some of them on tractors used in construction work but he said that such tractors were primarily logging tractors. He described the various components of a logging tractor and said that in most of them there is a winch. On some tractors there may be a blade or a front end loading fork. In other cases special guards for logging may be installed. He said that a crawler tractor is a complete unit in itself without a winch, but that the prime purpose of a skidder is to winch logs; that without a winch, it is useless. He described a crawler tractor as a mobile frame for carrying tools and said that it would not be of much use and could not be sold without the tools installed for the job it was intended to do.

The witness said that the Garrett Company which purchased Gearmatic winches made a tractor called the "Tree Farmer" which had usage in orchards and agricultural pursuits, but was primarily used in harvesting wood. He stated that Gearmatic winches were at one time used on the 440 industrial crawler tractor produced by John Deere. He added that winches are generally used in road construction but that the size of the tractors on which the Model 9 winch is installed is not that normally so used. He said that Gearmatic winches were not adaptable to purposes other than logging,

and were not designed to control a load under a restraining speed. He had never seen one on a handling crane.

Mr. Garrett testified that he uses the 8A model winch on the tractor called the "Tree Farmer". He stated that he had formerly used other makes of winch but they were unsatisfactory and that he now uses only the Gearmatic. He explained that the "Tree Farmer" was so constructed that it could take one end of a log and lift it completely off the ground and hold it there with the winch. He said it can actually pull a load heavier than the machine itself, which would not be possible without a winch. The winch is placed on the tractor right behind the operator's seat.

From the testimony and the exhibits, it is clear that the articles involved herein are parts of clutch assemblies which are parts of the winches designated as Models 8A, 8G and 9, manufactured by Gearmatic Co., Ltd. Plaintiff claims that they are, therefore, dutiable as parts of winches under the principle that a part of a part is dutiable as part of the whole, citing Richardson Co. v. United States, 8 Ct.Cust.Appls. 179, T.D. 37289; Landay Bros. v. United States, 5 Ct.Cust. Appls. 498, T.D. 35151; United States v. American Express Co., 29 CCPA 87, C.A.D. 175; Westinghouse Air Brake Co. v. United States, 26 Cust.Ct. 170, C.D. 1319; W. G. Carroll v. United States, 43 Cust.Ct. 83, C.D. 2108; Sunbeam Corporation v. United States, 53 Cust.Ct. 126, C.D. 2483.

In most of the cited cases, the competing paragraphs were basket provisions for manufactures in chief value of certain materials and provisions for parts of the whole. Here the competing provisions are (1) clutches and parts and (2) winches and parts.

W. G. Carroll v. United States, supra, involved paragraph 370 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802, which provided for motorboats and parts at 15 per centum ad valorem. A modification by the Torquay Protocol to said General Agreement, 86 Treas.Dec. 121, T.D. 52739, provided in said paragraph 370, for internal-combustion motorboat engines at 8¾ per centum ad valorem. Said protocol also provided in paragraph 353 for internal-combustion engines of the carburetor type and parts thereof at the same rate. The court held that parts for internal-combustion motorboat engines were classifiable as parts of motorboats since they were dedicated to use in motorboats and because paragraph 370, as modified by the Torquay protocol, did not provide for "parts" of internal-combustion motorboat engines.

In Warehousing Service, Inc. v. United States, 56 Cust.Ct. 260, C.D. 2635, it was held that not all internal-combustion engines of the carburetor type and parts were provided for in the *eo nomine* designation in paragraphs 353 and 372 of the Tariff Act of 1930, as modified, and that those provisions did not embrace engines which were dedicated for use as parts of some other instrument, device, or mechanism. The court concluded that piston and cylinder assemblies which were parts of internal-combustion machines of the carburetor type which engines were used exclusively in Volkswagen automobiles, vans, and trucks were more specifically provided for as parts of automobiles dutiable under paragraph 369(c), as modified.

The case last cited would support plaintiff's contention had the instant controversy arisen under the Tariff Act of 1930. It is not controlling here in view of the different language that is found in the Tariff Schedules of the United States.

The competing provisions here are item 680.54 which covers clutches and parts and item 664.10 which covers winches and parts. General Interpretative Rule 10(ij), supra, provides that a provision for "parts" of an article does not prevail over a specific provision for such part. Under this rule the clutches involved herein would be classifiable under item 680.54 even though they were parts of winches. J. E. Bernard & Co. v. United States, 59 Cust.Ct. 31, C.D. 3060.

Plaintiff claims, however, that Congress intended that all parts of winches, including clutches, should be classified under item 664.10. In support of this view, it is pointed out that according to the testimony of Mr. Liebert these clutch parts were formerly assessed as parts of machines under paragraph 372 of the Tariff Act of 1930, as modified, and that statements in the Tariff Classification Study of November 15, 1960, and the First Supplemental Report to the study indicate that no changes in rate were intended.

The Tariff Classification Study, schedule 6, page 265, states:

Item 64.10 covers elevators, hoists, winches, cranes, jacks, pulley tackle, belt conveyors and other lifting, handling, loading or unloading machinery, and conveyors * * *. The rate reflected (12.5 percent ad valorem) is the approximate arithmetical average of the rates currently applied thereto under the "basket" provisions in paragraphs 353 and 372.

Items 680.45–680.50, as originally proposed, included only gear boxes and variable speed gears. The additions reflected in the superior heading, supra, were made prior to the First Supplemental Report of the Tariff Commission (January 1962). It was there explained (p. 66):

The changes are for purposes of clarification of certain terms, and also to include several additional well-known articles of mechanical power transmission equipment (torque converters, sprockets, clutches, and universal joints), and parts of articles. The rates reflected for each of the various items are the existing rates imposed on the products covered thereby.

Plaintiff points out that the testimony herein establishes that there are standard clutches with multiuse applications and claims that the provision in item 680.54 relates to power transmission equipment-standard type clutches—and not to clutches designed specifically as integral parts of winches.

The difficulty with plaintiff's position is that item 680.54 and the superior heading both use the term "clutches" without modification, the only exception being for parts of motor vehicles, aircraft, and bicycles. It is well settled, of course, that an *eo nomine* statutory designation of an article, without limitation or a shown contrary legislative intent, judicial decision, or administrative practice, and without proof of commercial designation, will include all forms of the article. Nootka Packing Co. et al. v. United States, 22 CCPA 464, 470, T.D. 47464; United States v. Goffigon, 43 CCPA 172, 175, C.A.D. 625.

We do not think the statements in the Tariff Classification Study and the First Supplemental Report are sufficient to show a legislative intent to limit the provision for "clutches" to standard clutches or any particular type of clutch.

Plaintiff also claims that General Interpretative Rule (ij), supra, does not apply to competition between parts of one article and parts of another article, citing an abstract of a Bureau of Customs decision, 1 Customs Bulletin, T.D. 67–48(15). The abstract includes a statement that General Headnote 10(ij) is not applicable to competition between parts of one article and parts of another article. The statement is not supported by any reasoning or reference to authority and is not binding on the court.

In our view, it is much more logical to hold that since clutches which are parts of winches are classifiable under the specific provision for "clutches" rather than as parts of winches, clutch parts are classifiable under the provision for parts of clutches rather than as parts of winches. Such parts do not become parts of winches until they are first parts of clutches. Where a particular part of an article is provided for specially *eo nomine*, and must be classified under that provision regardless of whether it is a part of a whole, a part of that particular part is

more specifically provided for as a part of the part than as a part of the whole.

Apparently noting that the superior heading to item 680.54 excepts articles which are parts of motor vehicles, it is claimed that the within clutch parts are parts of winches which are integral and constituent components of tractors and are, therefore, dutiable under item 692.35 as parts of tractors.

In United States v. Pompeo, 43 CCPA 9, C.A.D. 602, it was held that superchargers, designed specifically for use on automobile engines, were dutiable as parts for automobiles rather than as machines, not specially provided for. The evidence there established that once installed, the superchargers became integral, constituent and component parts without which the engines would not operate.

In Gallagher & Ascher Company v. United States, 52 CCPA 11, C.A.D. 849, it was held that auxiliary heaters for use in Volkswagen automobiles were dutiable as parts of automobiles. The court noted particularly that the heater, once installed, contributed to the safe and efficient operation of the Volkswagen in frigid temperatures by assisting in the removal of ice from the windshield and providing for the comfort of the passengers. The court stated (pp. 13–14):

> * * * whether a given article constitutes a part of another article depends upon the nature of the so-called part and, we might add, to some degree on the function and purpose of the so-called part in its relation to the article to which it attaches or with which it is designed to serve.

■ Here the winch is attached to the tractor and is powered by the tractor engine but it does not have any purpose or function in the operation of the tractor as a tractor. Tractors may be used to pull a plow, harrow, reaper, or other articles, or to push, drag, or draw, or they may be used in other ways with various tools for whatever job they may be doing. A tractor remains a tractor with or without a winch and the winch does not contribute to its operation as a tractor. A winch is but one of the accessory tools that may be used on a tractor. Others mentioned by the witnesses include blades, loading forks, guards, and rubber-tired logging arches. Mr. Bonar testified that a crawler tractor is a mobile frame for carrying tools and that it is complete without a winch. Obviously, it would not do a particular job without the required tools, but it would still be a tractor.

In the Tariff Classification Study of November 15, 1960, issued prior to the adoption of the Tariff Schedules of the United States, it is stated in schedule 6, part 6, page 325, that "Tractors are mobile power units used for many purposes, including agricultural, construction, road building, etc." The tractors involved here, whether or not equipped with winches, are complete mobile power units, whose power could be used to operate tools other than winches.

■ The Superior heading to items 692.30–692.35 which cover tractors provides:

> Tractors (except tractors in item 692.40 and except automobile truck tractors), whether or not equipped with power take-offs, winches, or pulleys, and parts of such tractors:

This language implies that power take-offs, winches, and pulleys are considered to be equipment for tractors rather than parts of tractors. Furthermore, in view of General Interpretative Rule (ij), supra, even if winches were deemed to be parts of tractors, they would be classifiable under item 664.10, supra, as winches. To sustain plaintiff's contention here, we would have to hold not only that these winches are parts of tractors and that these clutches are parts of winches, but that these clutches and parts of clutches are parts of motor vehicles and fall within the exception in item 680.54.

■ The clutch parts in this case clearly belong to the clutch of the winch and not to the clutch or clutches of the

tractor itself. For instance, the witness Bonar pointed out that a crawler tractor has steering clutches on both sides so they can engage or disengage one or the other of the crawlers in the method of steering.

Mr. Garrett was asked to enumerate some of the types of items on which his firm uses clutches and stated:

A. \* \* \* on the different tractors that we have built we have had to have clutches in all of them, and we have had 8 or 10 different separate models of tractors. We have built for the cliffs, trains, fining roaders, this type of thing all with clutches in them.

Q. And normally when you design a tractor or other vehicle which shows the need of a clutch where do you obtain the clutch? A. Well, we have a reference library in clutches, and we see what is available on the market as self-contained mass-produced items, to get the best price and best delivery.

He added that the clutch assembly in the instant case has no application other than in the winch. It is housed in the winch assembly and its control may or may not be attached to the tractor. Obviously, it is the clutch for the winch and not for the tractor itself.

In our view General Interpretative Rule (ij) was intended to prevent a circuity of construction which would hold parts of a winch clutch to be classifiable as parts of a tractor. See Tariff Commission Submitting Report, dated November 15, 1960 (p. 19):

\* \* \* At the present time, much uncertainty exists in connection with the tariff treatment of parts of articles. In some instances, a mere provision for "parts" prevails over much more specific descriptions in the tariff schedules. Even certain "universal" components such as nuts, bolts, screws, and so forth, are sometimes classified as parts of a particular article according to their type and specific uses. In the proposed schedules, specific provision is made for the more usual components of articles. Under the rule

expressed in headnote 10(ij), these specific provisions will prevail over a mere provision for "parts" of a particular article.

For the reasons stated, we hold that the within clutch parts are classifiable neither as parts of winches nor as parts of tractors. They were properly assessed with duty by the collector as parts of clutches under item 680.54, supra. The protests are overruled and judgment will be entered for the defendant.

RAO, C. J., and FORD, J., concur.